# UNITED STATES DISTRICT COURT
## FOR THE DISTRCT OF COLUMBIA

**DOMINIQUE JEFFERSON**
Central Detention Facility
1901D St SE Washington DC 20003

Plaintiff, on behalf of himself and all others
similarly situated,

|  |  |
|---|---|
|  | **Civil Action No. 22-1430** |

v.

**GOVERNMENT OF THE DISTRICT OF COLUMBIA,**

**SERVE:**

Mayor Muriel Bowser
Designee Darlene Fields
Civil Litigation Division
400 6th Street, NW
Washington, DC 20001

and
Karl A. Racine, Esq.
D.C. Attorney General
Designee Darlene Fields
Civil Litigation Division
400 6th Street, NW
Washington DC 20001

and

**JEANETTE MYRICK**
Central Detention Facility (DCJail)
1901D St SE Washington DC 20003,

Defendants.

---

## CLASS ACTION COMPLAINT FOR DAMAGES
## AND DECLARATORY RELIEF AND INJUNCTIVE RELIEF WITH JURY
## DEMAND

---

## INTRODUCTION

1.      This is a class action complaint for a judgment for money damages and declaratory judgment and injunctive relief under 42 U.S.C. § 1983 law against the Government of the District of Columbia (sometimes the "District of Columbia" or the "the District") and for money damages under the common law against Jeanette Myrick.

2.      Dominique Jefferson (sometimes the "Named Plaintiff"), on behalf of himself and the classes defined below, brings this action against the defendants because they caused him and the other members of the classes defined below to be overdetained in the DC Jail past their Release Dates (6:00 p.m. on the dates on which they were entitled to be released).[1]

## PARTIES

3.      Mr. Jefferson is an adult and a longtime resident of the District of Columbia area.

4.      Defendant Government of the District of Columbia is a municipal corporation and is a "person" under 42 U.S.C. § 1983.

5.      Jeanette Myrick was at all relevant times the Lead Supervisory Legal Instruments Examiner in the Records Office of the DOC or, alternatively, she was in a position to know about the over-detentions complained of here and to report them up the chain of command or notify the courts or train persons in the Records Office to perform these tasks.

6.      As Lead Supervisory Legal Instruments Examiner, Jeanette Myrick is a policymaker for the DOC's processes to ensure that all inmates at the D.C. Jail are detained with sufficient authorizing documentation and, where documentation or authority

---

[1] As used herein, "DC Jail" includes the DOC's Central Detention Facility and the Correctional Treatment Facility.

is deficient, initiating the process of either obtaining sufficient documentation or authority, or the process of releasing the inmate.

7.      Jeanette Myrick was at all relevant times acting within the scope of her employment.

## THE REENTRY AND SANCTIONS CENTER

8.      The Reentry and Sanctions Center (RSC) is a short-term (28-60 days) residential patient facility operated by Court Services and Offender Supervision Agency (CSOSA) on the grounds of the DC Jail that houses pre- and post-sentenced defendants with substance abuse histories and defendants who, by using substances, violate the conditions of their release. It has capacity for 102 persons (about 80% men and 20% women).[2]

9.      The services RSC provides include assessment, counseling, treatment readiness, and referral to treatment facilities.

10.     RSC is a residential treatment readiness program which defendants complete prior to placement in residential or outpatient substance abuse treatment, and provides interventions for defendants with mental health and substance abuse disorders.

11.     The District and the DOC also utilizes other residential treatment facilities in addition to RSC and that are substantially similar to RSC in terms of conditions of confinement and treatment provided to persons committed there.

12.     Other residential treatment facilities in addition to RSC and that are substantially similar to RSC in terms of conditions of confinement and treatment provided to persons committed there include but are not limited to: Salvation Army Harbor Lights, Regional

---

[2]CSOSA is the agency that supervises all offenders placed on probation by the Superior Court of the District of Columbia. D.C. Code § 24-133(c)(3).

Addiction Prevention (RAP), Federal City Recovery Services, Psychiatric Institute of Washington (PIW), Teen Challenge and St. Elizabeth's.

13.     In some cases CSOSA picks up the defendant from the DC Jail and delivers them to the residential treatment facilities and sometimes another entity delivers the person to the residential treatment facilities.

## OVERDETENTIONS CAUSED BY DELAY IN PLACING PERSONS INTO THE REENTRY AND SANCTIONS CENTER

14.     In the Superior Court of the District of Columbia, Judges (including Magistrate Judges) frequently sentence defendants (including re-sentencing after revocation of probation) to a definite term of incarceration (including time served) followed by probation with a condition of probation that at the end of the sentence the defendant shall be released into the custody of CSOSA for placement into the RSC or into other similar residential or outpatient substance abuse treatment, and defendants with mental health and substance abuse disorders.

15.     Defendants are also with regularity ordered into RSC and other such facilities as part of pretrial release conditions.

16.     Other defendants in criminal cases are routinely and frequently ordered into RSC and other such residential treatment facilities pre-sentencing as part of a deferred sentencing agreement.

17.     This procedure of releasing the inmate into the custody of CSOSA for placement into RSC and other such facilities is called a "bed-to-bed" transfer.

18.     There has for years been an ongoing backlog of defendants waiting for bed space in RSC and other such facilities at any one time so that defendants ordered released into the

custody of CSOSA for placement into RSC and other such facilities spend extra time — days and even weeks — in the DC Jail waiting for a bed, which effectively means that a person's time at the DC Jail is lengthened while waiting for bed space in RSC and other such facilities.

19.     Each of the types of commitments described results in an overdetention because the defendant spends more time in the DC Jail than ordered or sentenced.

### DETAILS OF MR. JEFFERSON'S OVERDETENTION IN THE DC JAIL/CTF WHILE AWAITING PLACEMENT IN RSC

20.     Mr. Jefferson's overdetention was caused by: (1) the District's policy and/or custom in which defendants ordered released into RSC and other such facilities (whether immediately or upon a fixed period of time) are detained in the DC Jail while waiting for CSOSA to clear a bed for them and pick them up from DOC custody; and (2) the District's policy and/or custom of not informing the sentencing or committing judges, the defendants, and defense attorneys while waiting for CSOSA to come pick up the defendants.

21.     Mr. Jefferson continued to be held in the DC Jail after his sentencing on August 16, 2021, at which time he was sentenced to 180 days all jail time suspended.

22.     Mr. Jefferson's Release Date was August 16, 2021.

23.     Mr. Jefferson's sentence in the Judgment and Commitment Order imposed the condition of probation.

24.     One of Mr. Jefferson's conditions of probation was Inpatient treatment through in a residential treatment facility.

25.     The sentencing court further issued a release or transfer order stating, "It is

Class Action Complaint • *Jefferson v. Government of the District of Columbia*

HEREBY ORDERED that the defendant be released from your custody and into the custody of Representatives of CSOSA for a bed to bed treatment program."

26.     The Department of Corrections held Mr. Jefferson for about 30 days after his Release Date.

27.     The Defendants never obtained a court order authorizing them to detain Mr. Jefferson past his sentence expiration.

28.     Nor did any Defendant provide notice (to the committing judge, to Mr. Jefferson, and to his attorney) and a hearing to Mr. Jefferson when the Defendants decided to depart from the terms of the Judgment and Commitment Order and hold him past his Release Date.

29.     Thus, Mr. Jefferson was illegally overdetained in DOC custody for approximately 30 days.

30.     Moreover, he was subjected to a demeaning and humiliating strip-search each time he entered or left the DC Jail or detention facility.

31.     The DOC lacked authority to detain Mr. Jefferson past the completion of his sentence.

32.     To the extent that the DOC was ordered to release Mr. Jefferson to CSOSA rather than to his own custody but was also ordered to release him at the conclusion of his sentence, and could not comply with both terms, the delay deprived Mr. Jefferson of his protected liberty interest in being released on his Release Date. If the District could not release Mr. Jefferson to his own custody, it was obligated to provide process to Mr. Jefferson by way of notifying the committing judge **for a determination of by the committing judge** on Mr. Young's release conditions (confinement, release upon

Class Action Complaint • *Jefferson v. Government of the District of Columbia*

conditions such as daily reporting, heightened supervision with a GPS monitor, release into his own custody).

## OTHER RECENT EXAMPLES

### Christopher Tyson

33.    Another recent example of the policy and/or custom "of holding persons ordered released to a third party until the third party comes to fetch them" is Christopher Tyson, who on March 22, 2019, was given a suspended sentence and placed on probation.

34.    Mr. Tyson's overdetention was caused by: (1) the District's policy and/or custom in which defendants ordered released into RSC (whether immediately or upon a fixed period of time) are detained in the DC Jail while waiting for CSOSA to clear a bed for them and pick them up from DOC custody; and (2) the District's policy and/or custom of not informing the sentencing or committing judges, the defendants, and defense attorneys while waiting for CSOSA to come pick up the defendants.

35.    Mr. Tyson continued to be held in the DC Jail after his sentencing on March 22, 2019, at which time he was sentenced to 6 months in jail.

36.    Mr. Tyson had been incarcerated in that case since October 30, 2018. Therefore, because of accrual of credit for time served, his Release Date was on or about April 29, 2019.

37.    Mr. Tyson's sentence in the Judgment and Commitment Order read, "Credit for Time Served. At the conclusion of the Sentence of Incarceration, the Defendant is to receive a Bed-to-Bed Transfer to the Reentry and Sentence Center (RSC) for inpatient treatment."

**38.**      One of Mr. Tyson's conditions of probation was "Inpatient treatment through the Reentry and Sanctions Center."

39.      The sentencing court further issued a release order stating, "It is HEREBY ORDERED that the defendant be released from your custody <u>at the conclusion of the Sentence of Incarceration</u> and into the custody of Representatives of CSOSA for a Bed-to-Bed Transfer to the Reentry and Sanctions Center (RSC)." (Bold and underline emphasis in original.)

**40.**      On or about April 24, 2019, the DOC let CSOSA know (by email from Denyne Littles on behalf of DOC Records Management to various persons at CSOSA) that Mr. Tyson was "now available" to be transferred to RSC and that his sentence was expiring April 30, 2019.[3]

**41.**      On or about April 26, 2019, the DOC again emailed CSOSA to schedule his pick-up, with his Release Date again stated as April 30, 2019 (email from Kevin Lewis on behalf of DOC Records Management to various persons at CSOSA).

**42.**      The DOC received no response from CSOSA and so on or about May 1, 2020, the DOC informed CSOSA by email that Mr. Tyson's sentence had expired, that he had been available for pick-up since April 30, 2019, and that Mr. Tyson should be picked up that day (email from Shelly Chisholm on behalf of the DOC Records Management to

---

[3] Mr. Tyson's Release Date was April 29, 2019, not April 30. *See., e.g.,* D.C. Code § 24-211.02a(a)(3) ("the inmate shall be released before noon on his or her scheduled release date"); D.C. Code § 24-201.06 (inmates at work reformatory to be returned to the District and released "on the day of the expiration of sentence"); 18 USCS § 3624 ("The prisoner shall be released ... on the date of the expiration of the prisoner's term of imprisonment.").

various persons at CSOSA).

43.     After that, the DOC did nothing with respect to Mr. Tyson's release even though his Release Date had passed on or before April 29, 2019.

44.     On May 6, 2019, by memo directed and emailed to Jeanette Myrick, CSOSA informed the Records Office that it scheduled Mr. Tyson's pick-up for May 15, 2019.

45.     On May 8, 2019, by memo directed and emailed to Jeanette Myrick, CSOSA informed the Records Office that Mr. Tyson's pick-up was re-scheduled for May 23, 2019.

46.     Still, the Defendants did nothing with respect to Mr. Tyson's release even though his Release Date had passed on or before April 29, 2019.

47.     The DOC released Mr. Tyson to CSOSA and RSC on May 23, 2019.

48.     The Defendants never obtained a court order authorizing them to detain Mr. Tyson past his sentence expiration (April 29, 2019).

49.     Nor did any Defendant provide notice (to the committing judge, to Mr. Tyson, and to his attorney) and a hearing to Mr. Tyson when the Defendants decided to depart from the terms of the Judgment and Commitment Order and hold him past his Release Date.

50.     Thus, Mr. Tyson was illegally overdetained in DOC custody for approximately 24 days.

51.     Moreover, he was subjected to a demeaning and humiliating strip-search each time he entered or left the DC Jail or detention facility.

52.     The DOC lacked authority to detain Mr. Tyson past the completion of his sentence.

53.     To the extent that the DOC was ordered to release Mr. Tyson to CSOSA rather than to his own custody but was also ordered to release him at the conclusion of his

sentence, and could not comply with both terms, the delay deprived Mr. Tyson of his protected liberty interest in being released on his Release Date. If the District could not release Mr. Tyson to his own custody, it was obligated to provide process to Mr. Tyson by way of a hearing before the committing judge for a determination of what would happen to him.

### Felicia Lewis (2020 DVM 001585)

54.    Another recent example of the policy and/or custom "of holding persons ordered released to a third party until the third party comes to fetch them" is Felicia Lewis (2020 DVM 001585), who on February 23, 2021, was given a suspended sentence and placed on probation.

55.    As a condition of probation the sentencing judge ordered Ms. Lewis released into the custody of CSOSA upon completion of her sentence for placement into RSC.

56.    The DC Jail overdetained Ms. Lewis for 16 days before CSOSA arrived to pick her up.

57.    On information and belief the Records Office did not, prior to overdetaining Ms. Lewis, inform the sentencing judge and defense counsel to schedule a hearing to address the imminent overdetention.

58.    The Judgment and Commitment Order read, "Credit for Time Served. At the conclusion of the Sentence of Incarceration, the Defendant is to receive a Bed-to-Bed Transfer to the Reentry and Sentence Center (RSC) for inpatient treatment."

59.    A condition of probation in Ms. Lewis's probation order read:

Enter and successfully complete Anger Management Classes
Drug Screening / Testing as deemed appropriate by CSOSA

Mental Health Screening/Evaluation and or Treatment as deemed appropriate by CSOSA
***DEFENDANT IS TO BE RELEASED INTO THE CUSTODY OF A CSOSA REPRESENTATIVE ONLY FOR BED TO BED PLACEMENT*** ***CSOSA 202-585-7233***

60.    Ms. Lewis's "Release or Transfer" order read:

The Defendant having been committed to D.C. Jail,
TO: Superintendent, D.C. Jail and Superintendent, St. Elizabeth's Hospital:
It is HEREBY ORDERED that the defendant be released from your custody and into the custody of a Representative of a Drug Treatment Program or CSOSA (BED TO BED PLACEMENT).

## THE DISTRICT'S POLICIES AND PRACTICES

61.    The DOC holds, among other persons, persons being held pretrial and persons serving misdemeanor sentences imposed by Superior Court judicial officers.

62.    The DOC holds prisoners in the Central Detention Facility (CDF), the Correctional Treatment Facility (CTF), and at various halfway houses located in the District of Columbia.

63.    In the case of inmates to be transferred to a third-party such as CSOSA for the RSC and other similar substance abuse and mental health treatment facilities, it is the policy and/or custom of the DOC to hold persons such as Mr. Jefferson until the third party receives them, regardless how long that takes past the inmate's Release Date, without providing notice (to the inmate and his or her attorney) and a hearing to the inmate such as taking the inmate to a judicial officer for a hearing.

64.    The DOC knows from experience that CSOSA has a longstanding practice of not picking up inmates to be transferred to a facility at the conclusion of their sentences; CSOSA has a longstanding practice of not picking them up for the RSC and other similar substance abuse and mental health treatment facilities until two or more weeks have

passed.

65.     Knowing this the Records Office should have contacted CSOSA as soon as Mr. Jefferson was sentenced.

66.     In Mr. Jefferson's case, the terms of his sentence obligated the DOC to transfer Mr. Jefferson to a representative of CSOSA, not about 30 days after the conclusion of his sentence.

67.     The District's policy, custom, and/or practice was to hold Mr. Jefferson and similarly-situated persons indefinitely. If a transfer could not happen for months (for instance, if the third party suspended accepting new patients due to overcrowding or running behind schedule), the District's policy custom, policy, and/or practice would cause the DOC to hold the inmate for months.

68.     The Plaintiff contends that the relevant policy and custom of the DOC is to defer and shift blame to **any** third party the responsibility for releasing an inmate who is in DOC custody. Whatever third party is supposed to pick up an inmate (e.g., CSOSA, the Marshals Service), or if the federal Bureau of Prisons is supposed to calculate the sentence, or the Parole Commission is supposed to provide paperwork, the DOC keeps the inmate incarcerated until the third party acts, even where the DOC has actual or constructive notice that the inmate is being overdetained.

69.     Allegations about other cases are on information and belief, and are based on the results of Plaintiff's counsel's investigation with sources having personal knowledge.[1]

---

[1]Plaintiff's counsel conducted their investigation by obtaining information from defendants, court documents, members of the "CJA Bar" (attorneys practicing criminal defense in the District of Columbia Superior Court who partly or solely represent persons through appointments under the Criminal Justice Act), persons with knowledge of the system (for

70.     Some examples of the above are:

a.      Persons waiting to be picked up, such as the Plaintiff and Carlton Harris (overdetained 77 days at D.C. Jail, March 28, 2017 to June 15, 2017, waiting for the United States Marshals Service to pick him up).

b.      Delays/procrastination by the federal Bureau of Prisons in calculating a sentence of someone in DOC custody, such as Maurice Singletary (overdetained 97 days at D.C. Jail, January 29, 2020 to May 5, 2020, awaiting a calculation by the BOP after re-sentencing) and Abdelrahman Yaakoub (10/15/19 parole decision with fixed new term, 5/22/20 Release Date, 5/28/20 release (6 days)).[5]

c.      Persons who are entitled to parole release but the District sits and waits for parole documents, such as Floyd Nash (2/20/19 parole decision, 4/13/19 release date, 6/13/19 released (61 days)) and Irvin Courts (10/19/20 parole decision, 11/29/20 release date, 12/6/20 released (7 days)).

d.      In 2017 at several criminal hearings involving defendants with mental illnesses, Judge Milton C. Lee Jr. ordered leaders from St. Elizabeth's, the District's psychiatric hospital, as well from the city's Department of Behavioral Health, to appear and explain the treatment of patients. In 2017, Judge Milton Lee of the District of Columbia Superior Court Lee held a contempt hearing for the agency after learning it had failed to provide numerous jailed defendants with court-ordered psychological

example, persons who act as investigators), and persons employed by government agencies.

[5]Federal-designated prisoners have may have sentences expire while in DOC custody where they have been transferred to DOC custody for a pending matter, or where a new sentence expires pending federal designation/transfer.

Class Action Complaint • *Jefferson v. Government of the District of Columbia*

evaluations to determine whether they should be transferred to a hospital for more extensive treatment. Supervisors at the time told Lee the agency was too understaffed to keep up with the court-ordered evaluations.

    e.    Many other examples would be available in the public domain except for the practice of subjecting such overdetentions and the procedures and documents that memorialize them to protective orders in pending cases.

71.    Regarding a more narrowly-viewed policy and/or custom (*i.e.*, transfers to RSC and other similar substance abuse and mental health treatment facilities), multiple criminal defense attorneys practicing in the Superior Court have reported to Plaintiffs' counsel that CSOSA usually has a lag of one to five (and possibly more) weeks until placement into RSC and other similar substance abuse and mental health treatment facilities. Criminal defense attorneys have reported having about two such cases per year per attorney.

72.    Upon information and belief, dozens if not hundreds of defendants each year are overdetained due to these delays; and there is always some lag in placement.

73.    Based on Plaintiff's counsel's pre-discovery investigation, for several years defendants ordered into RSC and other similar substance abuse and mental health treatment facilities have been experiencing delays of one to five (and possibly more) more weeks before placement in RSC and other similar substance abuse and mental health treatment facilities which effectively lengthen their sentences or other period of commitment to the DOC.

74.    The DOC has a longstanding policy and/or custom of routinely holding defendants in the DC Jail for one to five (and possibly more) weeks while waiting for CSOSA to pick up the defendants for transfer to RSC and other similar substance abuse and mental health

treatment facilities.

75.     The first incident of a specific "bed to bed placement" in the last several years that was delayed for a long period of time and that Plaintiff's counsel discovered was in November 2017 when a female defendant waited 34 days after the end of her sentence for placement in RSC or another facility.

76.     Another defendant was placed in RSC or another facility on about November 13, 2017 after a 17 day overdetention in the DC Jail.

77.     Another defendant in the same period was overdetained more than 3 weeks in the DC Jail before placement in RSC and other similar substance abuse and mental health treatment facilities.

78.     Plaintiff's counsel are aware of a defendant overdetained for a week or two in DC Jail in 2019 while waiting for a pick up by CSOSA.

79.     See also, Felicia Lewis and Christopher Tyson above for other recent examples.

80.     One CJA lawyer described as "fairly common" the situation where a defendant is overdetained in the DC Jail or CTF simply waiting on space in the RSC and other similar substance abuse and mental health treatment facilities to open up.

81.     Another CJA lawyer reported that each year he sees at least two clients overdetained in the DC Jail while waiting for CSOSA to come pick up the defendants.

82.     On information and belief the DOC has never informed a Superior Court judge of the overdetentions and requested a hearing for a defendant being overdetained.

83.     Additionally, in Christopher Tyson's case various DOC employees — including Denyne Littles (4/24/19 email), Kevin Lewis (4/24/19 email), Shelly Chisholm (5/1/19 email), and lead supervisor Jeanette Myrick — followed the same practice in business-as-

usual fashion. Even after knowing what happened, no one at the DOC created an "overdetention" memo or other record suggesting that this was deemed an overdetention or anything out of the ordinary that would require reporting and documentation. The actions here reasonably imply the DOC employees were following an established policy and/or custom of waiting for the third party to pick up the inmate even if it meant detaining the inmate past their Release Date.

84.     In a motion in Mr. Tyson's case the DOC has represented its position that CSOSA, not the DOC, is responsible for ensuring that inmates in these situations are released when required. This also creates a reasonable inference that there is an official DOC policy and/or custom of deferring to and shifting blame to CSOSA the responsibility of ensuring timely transfer of inmates in DOC custody and ordered to be transferred to RSC and other similar substance abuse and mental health treatment facilities.

85.     It is obvious from the way that the Records Office staff handled Mr. Jefferson's overdetention that they believed they were handling his case according to "policy" and the District's litigating position in the motion supports the inference.

86.     The fact that officials sent three emails notifying CSOSA around the time of Mr. Tyson's sentence expiration is therefore not inconsistent with deliberate indifference to what would happen when CSOSA failed to respond to those emails.

87.     And it is the pattern of inaction when CSOSA failed to respond, not the failure to notify CSOSA, that violated his constitutional rights.

88.     The District's vigorous defense of its practices and policies and the District's willingness to produce the emails on the record in Mr. Tyson's case  supports the inference that the practice is the standard operating procedure and that it is the same in the case of

Mr. Tyson's and other class members' over-detentions.

## ALTERNATIVES TO OVERDETAINING DEFENDANTS IN THE DC JAIL

89.     The District has at its disposal several options in lieu of overdetaining defendants in the DC Jail while waiting for CSOSA to pick them up for a bed to bed placement in the RSC and other similar substance abuse and mental health treatment facilities.

90.     For example, the District could contract with other facilities to provide the services provided by RSC and other similar substance abuse and mental health treatment facilities.

91.     CSOSA provides many types of heightened supervision release options for defendants such as home custody with GPS monitoring.

92.     Another alternative is simply to bring the matter to the attention of the committing judge. The District must, "at a minimum, promptly inform the prisoner, the sentencing court and the attorneys for both parties of their determination that the [commitment and release] cannot be lawfully implemented." *Francis v. Fiacco*, 942 F.3d 126, 145 (2d Cir. 2019).

## STRIP SEARCHES

93.     The DOC strip searches every prisoner coming into or out of the DC Jail or CTF in humiliating strip-searches.

## CLAIMS

### Claim 1
### False Imprisonment Against Defendant Myrick

94.     Mr. Jefferson realleges and incorporates by reference all allegations set forth in this Complaint.

95.     This claim is filed against Jeanette Myrick (in her individual capacity) for direct liability for false imprisonment.

96.     Mr. Jefferson was sentenced by a Superior Court judicial officer to serve a determinate sentence at the DC Jail.

97.     DOC employees placed Mr. Jefferson in a jail cell and restrained him there.

98.     The District's duty to release Mr. Jefferson arose on or about August 16, 2021, when his sentence ended and there was no other basis to hold him.

99.     Jeanette Myrick, Lead Supervisory Legal Instruments Examiner, caused Mr. Jefferson's false imprisonment by failing to release him on his Release Date (when the legal basis for his detention expired) and instead restrained him, or by failing to give notice (to him, his attorney, and the sentencing judge) and a hearing.

100.    As the Lead Supervisory Legal Instruments Examiner, Jeanette Myrick had at least constructive knowledge of Mr. Jefferson's overdetention, and on information and belief she had actual knowledge no later than August 16, 2021, and had responsibility for checking the sentence calculation and other processes by which Mr. Jefferson should have been released on his Release Date.

101.    Instead of releasing Mr. Jefferson by August 16, 2021, the Defendant by her actions continued to hold Mr. Jefferson and restrained him without justification until about 30 days later.

102.    Instead of taking or sending Mr. Jefferson to a judicial officer by August 16, 2021 to authorize his continued detention past his Release Date (or other outcome such as his release pending admission to a bed to bed treatment facility), the Defendant by her actions continued to hold Mr. Jefferson and restrained him without justification until August 16,

18

2021.

103.    As a direct and proximate result of his false imprisonment Mr. Jefferson suffered

general and special damages including confinement, associated harm, and emotional

distress.

## Claim 2
## Negligence Against Myrick

104.    Mr. Jefferson realleges and incorporates by reference all allegations set forth in this

Complaint.

105.    This claim is filed against Jeanette Myrick (in her individual capacity) for direct

liability for negligence.

106.    Defendant Myrick had common law and statutory duties to release Mr. Jefferson

on his Release Date, or by on or about August 16, 2021.

107.    Jeanette Myrick during all relevant times was the Lead Supervisory Legal

Instruments Examiner in the Records Office at the D.C. Jail.

108.    Legal Instrument Examiners are the D.C. Jail employees responsible for processing

release and commitment documents including release orders received from the D.C.

Superior Court, and ensuring that the DOC has authority for detaining inmates and where

further authority would be necessary, sending the inmate to a judicial officer for a hearing.

109.    Ms. Myrick during all relevant times was responsible for "oversee[ing] the day-to-

day operations of the Records Office" at the D.C. Jail.

110.    Ms. Myrick is also the supervisor required "to make sure that the inmates are

released" on their Release Dates.

111.    At all times relevant, Ms. Myrick knew, or reasonably should have known, that she

Class Action Complaint • *Jefferson v. Government of the District of Columbia*

was failing to process prisoner releases such as and including Mr. Jefferson in a timely fashion.

112.    Notably, Ms. Myrick even maintained a file of "overdetention reports."

113.    Despite the known problem of overdetentions, Ms. Myrick failed to take adequate steps to prevent the overdetention of prisoners at the D.C. Jail, including Mr. Jefferson.

114.    In fact, Ms. Myrick has admitted that the Department of Correction's written policy of requiring Legal Instrument Examiners to "obtain and review printouts from ... Courtview" when processing a prisoner release was not the actual practice or custom for the Legal Instrument Examiners that she supervised during all relevant times.

115.    The Defendant negligently breached her duties to ensure Mr. Jefferson's release on his Release Date, or alternatively to get judicial authority for further commitment, or to provide Mr. Jefferson notice (to him and to his attorney) and a hearing on the deprivation of his right to release, and he was not released until on or after about 30 days after his Release Date of August 16, 2021.

116.    As a direct and proximate result of this negligence Mr. Jefferson suffered general and special damages including confinement, associated harm, and emotional distress.

### Claim 3
### § 1983 Liability of District of Columbia for Overdetentions – *respondeat superior*)

117.    Mr. Jefferson realleges and incorporates by reference all allegations set forth in this Complaint.

118.    Defendant District of Columbia is liable in *respondeat superior* for the torts of Ms. Myrick and the other agents of the District.

## Claim 4
### § 1983 Liability of District of Columbia for Overdetentions (Fifth Amendment – Substantive Due Process)

119.    Mr. Jefferson realleges and incorporates by reference all allegations set forth in this Complaint.

120.    The claim is filed against the District of Columbia.

121.    Mr. Jefferson has a right under substantive due process to be released after he has served his sentence.

122.    Holding Mr. Jefferson after his Release Date violated his substantive due process rights.

123.    **EXPLICIT POLICY**. The District had an explicit policy of detaining inmates past their release dates whenever a third party fails to take action that the DOC deems required to release the inmate, thereby causing unjustified overdetentions of Mr. Jefferson and other inmates in the DOC's facilities (e.g., failing to pick up the inmate, failing to calculate a Release Date, failing to send paperwork). This includes persons to be picked up by CSOSA for placement at the RSC and other such similar substance abuse and mental health treatment facilities.

124.    Explicit Policy included but is not limited to DOC's Program Statement 4353.1C which governs Admission, Transfers, and Releases of inmates in its custody.

125.    The stated purpose of the Program Statement is "[t]o provide guidelines for admission, transfer and release processes for inmates within the DC Department of Corrections (DOC)." Program Statement § 1.

126.    The Program Statement addresses releases including releases into third party custody. Program Statement § 17.

Class Action Complaint • *Jefferson v. Government of the District of Columbia*

127.    The Program Statement does not have a provision instructing DOC staff to take any action when the DOC is required to release an inmate into the custody of an outside agency such as CSOSA and the agency does not come to pick them up by the Release Date. This by default instructs the DOC staff to maintain the status quo by continuing to hold the inmate and take no other action.

128.    At this pleading stage, it is not known if there is some additional policy. However, in a motion in this case the DOC has represented its position that CSOSA, not the DOC, is responsible for ensuring that inmates in these situations are released at the end of their terms (Per the District: "The District's ability to timely release Tyson was contingent upon CSOSA's ability to schedule Tyson's pickup date." "The District's alleged failure to act was caused by CSOSA's failure to timely schedule Tyson for a transfer.") This creates a reasonable inference that there is an official DOC policy and/or custom of deferring to and shifting blame to CSOSA the responsibility of ensuring timely transfer of inmates in DOC custody and ordered to be transferred to CSOSA.

129.    Additionally, numerous DOC employees, as detailed above, acted as though they were following official policy.

130.    **CUSTOM**. The District had a longstanding and widespread problem of detaining inmates past their Release Dates waiting for third parties to provide clearance to release the person or to take custody, such as CSOSA, the Parole Commission, the BOP, the USMS, and others. (See "District's Policies and Practices" section preceding Claim 1).

131.    **DELIBERATE INDIFFERENCE.** The District failed to respond to the need, of which it had actual or constructive notice, for policies and actions that would prevent it from overdetaining persons held waiting action by third parties, such as CSOSA, the Parole

Commission, the BOP, the USMS, and others. The District was deliberately indifferent to the risk that not addressing the problem would cause overdetentions of inmates in its custody.

132.    The District's policies, customs, and deliberate indifference, as described above, directly, proximately, and affirmatively were the moving force behind the violations of Mr. Jefferson's and other DOC inmates' substantive due process Fifth Amendment rights, in which Mr. Jefferson was held for about 30 days past his Release Date.

133.    As a direct and proximate result of this violation Mr. Jefferson suffered general and special damages including deprivation of constitutional rights, confinement, associated harm, and emotional distress.

### Claim 5
### § 1983 Liability of District of Columbia for Overdetentions (Fifth Amendment – Procedural Due Process)

134.    Mr. Jefferson realleges and incorporates by reference all allegations set forth in this Complaint.

135.    This Claim is filed against the District of Columbia.

136.    A prisoner's liberty interest in freedom from detention implicates the Due Process Clause not only when a jury convicts him or when a court initially sentences him, but also when prison officials interpret and implement the sentence or other commitment and release order that the trial court has imposed.

137.    Mr. Jefferson had a liberty interest in avoiding incarceration after he had served his sentence.

138.    The sentence imposed by the sentencing judge in the Judgment and Commitment

Order conflicted with the District's policy, custom, and/or practice of holding inmates ordered into programs such as CSOSA's after the conclusion of their sentences until the third party came to collect them.

139.    As a result, Mr. Jefferson's sentence as implemented by the District's DOC diverged from the sentence originally pronounced by the sentencing court, which implicated Mr. Jefferson's liberty interest.

140.    Therefore, when the District, and its agents and employees and through its policymakers, declined to implement the sentencing court's directive of releasing Mr. Jefferson when his sentence expired, and retained custody of Mr. Jefferson after expiration of his sentence; the Due Process Clause required them to provide certain procedural protections to safeguard Mr. Jefferson's liberty interest in avoiding incarceration beyond his Release Date.

141.    At a minimum, procedural due process required the DOC to promptly inform Mr. Jefferson, the sentencing court, and the attorneys for both the government and Mr. Jefferson of their determination that the sentence as pronounced by the sentencing court could not — in its view — be implemented.

142.    The DOC failed to provide due process, such as sending Mr. Jefferson to court for a hearing before the sentencing judge with counsel for the parties.

143.    In fact, the District failed to provide any process.

144.    Thus in the circumstances of Mr. Jefferson's case, where CSOSA had a practice of failing to collect inmates for programs on their Release Date, the District violated the Due Process Clause by failing to provide these basic procedural protections to Mr. Jefferson at the conclusion of his sentence.

145.    For a description of the explicit policy, custom, and deliberate indifference, see previous Claim and allegations preceding Claim 1. The policies, customs, and deliberate indifference described previously include the failure to provide any due process.

146.    The District's policies, customs, and deliberate indifference, as described above, directly, proximately, and affirmatively were the moving force behind the violations of Mr. Jefferson's and other DOC inmates' procedural due process Fifth Amendment rights, in which Mr. Jefferson was held for about 30 days past his Release Date with process.

147.    As a direct and proximate result of this violation Mr. Jefferson suffered general and special damages including deprivation of constitutional rights, confinement, associated harm, and emotional distress.

## CLASS ACTION ALLEGATIONS
### Class Allegations for Each Class

**148.**    Mr. Jefferson as Named Plaintiff asks the Court to certify under Rules 23(a) and 23(b)(2) and (b)(3) the separate classes defined below on their own behalf and on behalf of the classes defined below injured (or presently subject to injury) by the policy and practices and customs of the District described herein.

### Claims One ,Two, Three and Four: False Imprisonment and Negligence and *respondeat superior* and Substantive Due Process Class.

149.    Mr. Jefferson brings this action under Rules 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person: (1) ordered to the custody of the Department of Corrections in the DC Jail, CTF, or a halfway house by a Superior Court Judge or Magistrate Judge; (2) for transfer to a "bed to bed" or residential treatment facility; and (3) overdetained in the DC Jail, CTF, or a halfway house

past 6:00 p.m. on their Release Date for transfer to the "bed to bed" or residential treatment facility.

**Claim Five: Procedural Due Process Class.**

150.    Mr. Jefferson brings this action under Rules 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of each person: (1) ordered to the custody of the Department of Corrections in the DC Jail, CTF, or a halfway house by a Superior Court Judge or Magistrate Judge; (2) for transfer to a "bed to bed" or residential treatment facility; and (3) overdetained in the DC Jail, CTF, or a halfway house past 6:00 p.m. on their Release Date for transfer to the "bed to bed" or residential treatment facility; and (4) for whom some employee or agent of the Department of Corrections did not notify the committing Judge or Magistrate Judge of the overdetention before the start of the overdetention.

## Class Allegations Applicable To All Classes

151.    Certification of a class under Federal Rule of Civil Procedure 23(b)(2) is appropriate, because defendant had a policy and engaged in a pattern and practice of conduct that has uniformly affected all members of the class and declaratory relief against Defendant will benefit each and every plaintiff and class member.

152.    The classes are entitled to declaratory and injunctive relief.

153.    Certification of classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and a class action is superior for the fair and efficient adjudication of this controversy as detailed below.

154.    Regarding the Named Plaintiff, and members of the classes, there are no individual questions on the issue of liability.

155.    Each class is so numerous that joinder of all members is impracticable. The exact number of class members is unknown to plaintiffs at this time, but, based information in the public domain, documents, and representations to this Court in other cases, is likely to consist of at least over 100 people for each class.

156.    The Named Plaintiff's claims are typical of the claims of the other members of the class, because the Named Plaintiff and all other members of each class to which they belong were injured by exactly the same means.

157.    The Named Plaintiff will fairly and adequately protect the interests of the members of each class to which they belong and has retained counsel who are competent and experienced in complex federal civil rights class action litigation.

158.    The Named Plaintiff has no interests that are contrary to or in conflict with those of each class to which they belong.

159.    The Named Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action, and the class action is superior to any other available means to resolve the issues raised on behalf of the Classes. The class action will be manageable because so many different records systems exist from which to ascertain the members of the putative class such as the DOC's inmate population database and the District's Superior Court docketing database, CourtView, and paper records.

160.    Defendant District of Columbia has within its computerized records and paper records the names and addresses of all the current and past class members.

161.    Class treatment will be superior because liability can be determined for each Named plaintiff and each class member on a class wide basis either as a matter of law or by using data from the police reports as supplemented by the District's computerized databases.

162.    General damages can be ascertained on a class-wide basis.

163.    Garden variety emotional distress type damages can be ascertained on a class-wide basis.

164.    Common questions of law and fact include whether the District through the DOC has a policy of holding persons committed to the DC Jail or the CTF for transfer to a residential treatment facility past their Release Dates violates the common law, substantive due process clause or procedural due process; whether the District through its DOC has a custom or practice of holding persons committed to the DC Jail or the CTF for transfer to a residential treatment facility past their Release Dates violates the common law, substantive due process clause or procedural due process; whether the District is liable in *respondeat superior* for the torts of its agents including Ms. Myrick; whether general damages or garden variety emotional distress type damages suffered by the class members can be ascertained on a class-wide basis.

## REQUEST FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court grant the following relief:

1.    a jury trial on all claims so triable;

2.    judgment in his favor;

3.    general and compensatory and consequential damages in an amount to be

determined at trial;

4.      nominal damages and a declaration that holding a person past their Release Date in the DC Jail or CTF while waiting for CSOSA to come pick them up for transfer to a bed to bed treatment facility violates their substantive due process rights;

5.      nominal damages and a declaration that holding a person past their Release Date in the DC Jail or CTF while waiting for CSOSA to come pick them up for transfer to a bed to bed treatment facility without notifying the committing Judge and counsel violates their procedural due process rights; and

6.      nominal damages and an injunction against holding persons past their Release Date in the DC Jail or CTF while waiting for CSOSA to come pick them up for transfer to a bed to bed treatment facility;

7.      nominal damages and an injunction against holding persons past their Release Date in the DC Jail or CTF while waiting for CSOSA to come pick them up for transfer to a bed to bed treatment facility without notifying the committing Judge or Magistrate Judge and counsel of record before the overdetention begins; and

8.      such other relief as this Court deems just and proper including an award of attorney's fees under 42 U.S.C. § 1988.

Respectfully submitted,

/s/ William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579
717 D Street, N.W., Ste 300
Washington, DC 20004
claibornelaw@gmail.com
202-824-0700

Class Action Complaint • *Jefferson v. Government of the District of Columbia*

Attorneys for Plaintiff

## JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.

/s/ William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579
Counsel for Mr. Jefferson